COURT OF APPEAL, THIRD CIRCUIT

**MURPHY CORMIER GENERAL CONTRACTOR, INC.**

**VERSUS**

**STATE OF LOUISIANA,**
**DEPARTMENT OF HEALTH & HOSPITALS, ET AL.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2007-3828, DIV. H
HONORABLE RONALD F. WARE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, James T. Genovese, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

**Hunter W. Lundy**
**Rudie R. Soileau, Jr.**
**Jackey W. South**
**Daniel A. Kramer**
**Lundy, Lundy, Soileau & South**
**501 Broad St.**
**Lake Charles, LA 70601**
**(337) 439-0707**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Murphy Cormier General Contractor, Inc.**

**Jeffrey Ackermann**
**Durio, McGoffin, Stagg & Ackerman**
**220 Heymann Blvd.**
**Lafayette, LA 70503**
**(337) 233-0300**
**COUNSEL FOR INTERVENOR/APPELLEE:**
    **National Wastewater Systems, Inc.**

**Elizabeth B. Hollins**
**Assistant Attorney General, Louisiana Department of Justice**
**One Lakeshore Dr., Suite 1200**
**Lake Charles, LA 70629**
**(337) 491-2880**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
     **Glenn Cambre**
     **State of Louisiana, Department of Health and Hospitals,**
     **Office of Public Health**

**GREMILLION, Judge.**

The defendant, the State of Louisiana, through the Department of Health and Hospitals (DHH), appeals a jury verdict in favor of the plaintiff, Murphy Cormier General Contractor, Inc. (MCGC).[1] For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

MCGC manufactures, sells, and installs residential and commercial mechanical sewage treatment plants in Calcasieu and surrounding parishes. In July 2007, MCGC filed a petition for damages and injunctive and declaratory relief against DHH and four of its employees, Dr. Jimmy Guidry, Glenn Cambre, Dane Thibodeaux, and Stanley Clause (collectively Defendants). MCGC claimed that it relied on the representation of Dr. Guidry that the revised regulations regarding residential mechanical sewage treatment plants, found in the Louisiana Sanitary Code, would not go into effect until March 31, 2001. Instead, MCGC claimed that Defendants prohibited the installation of sixty-eight residential sewage treatment plants beginning March 1, 2001, resulting in economic loss to the business. MCGC further alleged that DHH selectively enforced the new provisions, granting its competitors approval to sell and install sewer treatment plants that were not compliant with the new regulations. MCGC also claimed that DHH placed unreasonable requirements on its commercial mechanical sewage treatment plants that were contrary to law and negatively impacted it business.

In September 2007, DHH filed a declinatory exception of improper venue, urging that venue lay exclusively in the Nineteenth Judicial District Court for the Parish of East Baton Rouge. Following a March 2008 hearing, the trial court

---

[1] Sometimes we refer to Murphy Cormier, the owner of MCGC, rather than the company if the witness referred to him by name.

denied DHH's exception of improper venue. In November 2008, DHH filed a motion for summary judgment, which was denied. It also filed an exception of prescription, arguing that MCGC's claims were barred by a one-year prescriptive period. Following an August 2009 hearing, the trial court denied DHH's motions. DHH filed for supervisory writs with this court, which were denied in January 2010. The supreme court further denied writs. Additional extensive pre-trial motions were filed by the parties. In March 2011, MCGC filed a partial motion and order to dismiss Thibodeaux with prejudice. MCGC also dismissed Guidry and Clause without prejudice.

Defendants filed a motion to exclude testimony of plaintiff's expert, Daphne Clark. Following a March 2011 hearing, the trial court declined to exclude the testimony. Defendants applied for writs to this court, which were denied.

Following a ten-day jury trial in August 2010, both parties moved for directed verdicts on various issues, which were denied. The jury returned a verdict in favor of MCGC in the amount of $7,412,383.00 finding that DHH engaged in wrongful conduct, not subject to an immunity, that damaged MCGC. The damages awarded consisted of $4,525,846.00 for residential units, $99,560.00 for commercial units, and $2,786,977.00 for loss of business reputation. DHH filed a motion to conform judgment, relying on the statutory cap against state defendants found in La.R.S. 13:5106. The trial court denied the motion.

DHH filed a motion for new trial. Following a March 2, 2012 hearing, the trial court denied the motion. DHH now appeals.

**ISSUES**

DHH assigns as error:[2]

1. The trial court committed legal error when it failed to conduct a proper *Daubert* hearing on DHH's motion to exclude the testimony of Daphne Clark and when it, consequently, allowed MCGC to introduce Clark's speculative and flawed damage calculations at trial.

2. The trial court committed legal error when it denied DHH's exception of prescription and motion to limit damages, and further erred by allowing MCGC to introduce evidence of damages on prescribed claims.

3. The trial court committed legal error when it denied DHH's motion for summary judgment, finding that MCGC had a claim for selective enforcement and that DHH was not entitled to discretionary or qualified immunity.

4. The trial court committed legal error when it held that MCGC could legally assert a detrimental reliance cause of action against DHH for exercising its statutorily created powers and regulatory functions.

5. The trial court committed legal error by refusing to apply the statutory cap created by LSA-R.S. 13:5106 to the award for loss of business reputation damages.

6. DHH's exception of improper venue should be reexamined, because venue is only proper in East Baton Rouge Parish pursuant to LSA-R.S. 13:5104.

**FACTUAL BACKGROUND**

This case involves complex and detailed aspects of both residential and commercial wastewater treatment systems. Wastewater treatment systems are subject to various rules and regulations in the State of Louisiana. Louisiana Revised Statutes 36:258(B) authorizes the office of public health to act on behalf of the state in protecting the general health of the public:

> [I]ncluding but not limited to responsibility for the preparation and supervision of the Sanitary Code, local health units, sewage treatment

---

[2] We note that DHH's assignments of error do not correspond to its briefed arguments. We will address the issues in the order presented by DHH.

3

and disposal within the state. . . . It shall also perform those functions of the state provided by law relating to environmental quality and pollution control which are related to the public health and which are specifically assigned to the department, including but not limited to functions relating to the treatment and disposal of sewage within the state, with the exception of those functions assigned by law to the Department of Environmental Quality including, but not limited to, the licensing of sewage sludge transporters or haulers.

Louisiana Revised Statutes 40:4(6) states:

In order to protect the public against disease and nuisance resulting from the improper disposal of sanitary sewage, the state health officer shall prepare and promulgate all rules and regulations necessary to insure that adequate conveyance and disposal facilities are provided for all sanitary sewage, private or public, and in such a manner that will prevent the contamination of surroundings which would have an adverse impact on drinking water supplies, recreational waters, aquatic life, and other mechanisms of human exposure to disease. Standards for the quality of sanitary sewage discharged to the ground surface (ditches, streams, water pools, or other drainage courses), construction of sewerage works, operation of sanitary sewage conveyance, and treatment and disposal facilities shall be included. Such rules and regulations shall not include the licensing of persons engaged in the business or practice of hauling the contents of septic tanks, cesspools, vaults, or similar facilities. Plans and specifications for sewerage works shall be submitted for review and approval to the state health officer or his designee.

Further, La.R.S. 40:5(9) gives the state health officer and office of public health of DHH the "exclusive jurisdiction, control and authority [o]ver the treatment and disposal of municipal or domestic sewage."

Title 51, Part XIII, of the Louisiana Administrative Code comprises the Sanitary Code and pertains to sewage disposal. Section 725 governs mechanical wastewater treatment plants (also called aerobic treatment units or ATUs) that are residential in nature. In order to receive a permit to install a residential ATU, all plants approved for installation after March 1, 2001, "shall strictly comply with

4

National Sanitation Foundation [3] International Standard, NSF 40-1996 for Residential Wastewater Treatment Systems . . . as has been approved by the American National Standards Institute[.]"[4] LAC 51: XIII: 725(D) and (E).

A large portion of this case revolves around the interpretation and application of Section 729, which is entitled "Pumping Stations" and states in pertinent part:

> A. When the elevation of a site prevents the use of gravity flow to convey liquid from one location to another, a pumping station [§1501.B.19 (Figure 22)], consisting of a holding tank, pump(s), piping, electrical controls, and other equipment as necessary, must be provided.
>
> . . . .
>
> J. Suitable level control devices for use in the harsh, corrosive environment encountered, shall be provided to control pump operation. The level controls shall provide for the following functions: "pump off," "pump on," and "high water alarm."
>
> . . . .
>
> 4. The "pump on" level shall be set at elevation to provide a minimum working volume of 10 percent of the average daily design flow of the treatment system.

---

[3] National Sanitation Foundation (NSF), a non-profit organization, is accredited by the American National Standards Institute (ANSI) to test and evaluate ATUs. Standard 40 applies to wastewater treatment systems with capacities between 400 and 1500 gallons per day. NSF tests the ability of the ATU to produce an acceptable quality of effluent. This is accomplished by conducting a twenty-six week study of the ATU to measure the quality of the effluent performance. The system is also tested for "structural integrity, leakage, noise, electrical certification, access ports, failure sensing and signaling equipment (visual and audible alarms), flow design, data plate and service labels."

NSF provides a third-party certification of ATUs. Formerly, DHH conducted these reviews but it was determined that this process was too political in nature and that an objective third party should be brought in. The manufacturer of the ATU, such as MCGC, pays, as of the time of trial, upwards of $80,000.00 for the twenty-six week study of the unit. There are other third-party certification providers such as Baylor University in Texas.
http://www.nsf.org/business/wastewater_certification/standards.asp#std40

[4] Those ATUs that were approved for installation (but not necessarily installed yet) before March 1, 2001, "shall continue to comply with the standards under which they were approved." La.Admin. Code art. 725(E).

5. The "high water alarm" level shall be set so as to provide for a net storage volume between the "pump on" level and the "high water alarm level" of 10 percent of the average daily design flow of the treatment system.

6. A reserve volume may be provided between the "high water level" and the invert of the inlet pipe to the holding tank, if so desired.

Additionally, the industry often refers to and incorporates what is known as the "10 States Standards." The 10 States Standards are a comprehensive guide to the design and specifications of wastewater treatment plants.[5] The main issue surrounding the 10 States Standards in this case is Section 42.33 entitled "Pump Openings" under the subchapter titled "Wastewater Pumping Stations." Section 42.33 states: "Pumps handling raw wastewater shall be capable of passing spheres of at least 3 inches (80 mm) in diameter. Pump suction and discharge openings shall be at least 4 inches (100 mm) in diameter."

In Louisiana, wastewater permitting operates as follows: Residential systems (volume less than 3,000 gallons) are reviewed for permits by one of nine regional sanitarians, whereas commercial systems (volume greater than 3,000 gallons) permits are reviewed by DHH.

To summarize, regarding its residential units, MCGC claimed that (1) DHH selectively enforced the requirements of Section 729, Part J (4 and 5) such that its competitors were not required to increase their holding tank gallon size to accommodate Section 729's 10%/10% pumping station requirements and the selective enforcement resulted in extensive loss of business, as MCGC's costs

---

[5] The 10 States Standards is a report of the Wastewater Committee of the Great Lakes–upper Mississippi River Board of State and Provincial Public Health and Environmental Managers which was formed in 1947. A committee was formed with a representative of each state in order to comprise joint standards. Its member states include Illinois, Indiana, Iowa, Michigan, Minnesota, Missouri, New York, Ohio, Pennsylvania, and Wisconsin. The most recent edition of the 10 States Standards was promulgated in 2004. For more information, see http://10statesstandards.com/wastewaterstandards.html.

substantially increased to meet the requirements, and it lost business as its competitors were still offering the cheaper, smaller tanks. MCGC further claimed that it detrimentally relied on a DHH employee's promise to extend the date the new requirements would go into effect until March 31, 2001, instead of March 1, 2001. Regarding the residential units, DHH's primary argument is that Section 729 only applies to detached pumping stations, and not attached pumping stations. Thus, DHH argues that the 10%/10% requirements did not apply to MCGC's main competitors who used attached, rather than detached pump chambers, and, therefore, no selective enforcement took place.

Regarding its commercial units, MCGC's complaint is that a DHH employee, Karen Irion, Chief Engineer of DHH, intentionally and in retaliation, caused MCGC to experience long delays in obtaining permits and caused it to change the design of its commercial unit that had been approved and installed by DHH for more than twenty years. Additionally, MCGC claims DHH harmed its reputation by filing false claims against it with the Louisiana Professional Engineering and Land Surveying Board (LAPELS) and by causing engineering firms to not want to work with MGCG due to the long permitting delays and the complaint with LAPELS.

## DISCUSSION

### *Venue*

Louisiana Revised Statutes 13:5104(A) states (emphasis added):

All suits filed against the state of Louisiana or any state agency or against an officer or employee of the state or state agency for conduct arising out of the discharge of his official duties or within the course and scope of his employment shall be instituted before the district court of the judicial district in which the state capitol is located *or in the district court having jurisdiction in the parish in which the cause of action arises.*

7

The plain language of this statute authorizes the filing of suit in either of two places: the district court of the judicial district of the state capitol or the parish where the cause of action arose. Venue is a threshold matter that is unrelated to the merits of the case. The supreme court has specifically held that "litigants are required to seek review [of venue rulings] via supervisory writs. Failure to timely file a writ application on a venue ruling amounts to a waiver of any objection thereto." *Land v. Vidrine*, 10-1342, p. 7 (La. 3/15/11), 62 So.3d 36, 40. The inequities of allowing the losing litigant to make a claim of improper venue after a trial on the merits disregards the legislature's purpose in creating the venue rules. *Id.*

DHH admits that it did not seek supervisory writs of the trial court's denial of its exception of venue. Although DHH argues that the defendant, Dane Thibodeaux, who worked in a regional DHH office in Calcasieu Parish, was much later dismissed, we do not find this action sufficient to suggest that plaintiffs were forum shopping as in *Darbonne v. Allied Signal, Inc.*, 03-527 (La.App. 3 Cir. 11/12/03), 865 So.2d 772, *writ denied*, 03-3425 (La. 2/20/04), 866 So.2d 834. Thus, DHH waived any objection it may have had to venue in Calcasieu Parish. Accordingly, assignment of error six is without merit.

***EXPERT WITNESS/Daphne Borderlon Clark***

Louisiana Code of Civil Procedure Article 1425(F) discusses the use of expert witnesses at trial:

> (1) Any party may file a motion for a pretrial hearing to determine whether a witness qualifies as an expert or whether the methodologies employed by such witness are reliable under Articles 702 through 705 of the Louisiana Code of Evidence. The motion shall be filed not later than sixty days prior to trial and shall set forth sufficient allegations showing the necessity for these determinations by the court.

8

(2) The court shall hold a contradictory hearing and shall rule on the motion not later than thirty days prior to the trial. At the hearing, the court shall consider the qualifications and methodologies of the proposed witness based upon the provisions of Articles 104(A) and 702 through 705 of the Louisiana Code of Evidence. For good cause shown, the court may allow live testimony at the contradictory hearing.

(3) If the ruling of the court is made at the conclusion of the hearing, the court shall recite orally its findings of fact, conclusions of law, and reasons for judgment. If the matter is taken under advisement, the court shall render its ruling and provide written findings of fact, conclusions of law, and reasons for judgment not later than five days after the hearing.

(4) The findings of fact, conclusions of law, and reasons for judgment shall be made part of the record of the proceedings. The findings of facts, conclusions of law, and reasons for judgment shall specifically include and address:

   (a) The elements required to be satisfied for a person to testify under Articles 702 through 705 of the Louisiana Code of Evidence.

   (b) The evidence presented at the hearing to satisfy the requirements of Articles 702 through 705 of the Louisiana Code of Evidence at trial.

   (c) A decision by the judge as to whether or not a person shall be allowed to testify under Articles 702 through 705 of the Louisiana Code of Evidence at trial.

   (d) The reasons of the judge detailing in law and fact why a person shall be allowed or disallowed to testify under Articles 702 through 705 of the Louisiana Code of Evidence.

(5) A ruling of the court pursuant to a hearing held in accordance with the provisions of this Paragraph shall be subject to appellate review as provided by law.

Louisiana Code of Evidence Article 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

An expert's qualifications are subject to the familiar *Daubert* review:

> In *State v. Foret*, 628 So.2d 1116 (La.1993), the Louisiana Supreme Court adopted the test set forth in

> *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509
> U.S. 579, 113 S.Ct. 2786, 128 L.Ed.2d 469 (1993),
> regarding proper standards for the admissibility of
> expert testimony which requires the trial court to act
> in a gatekeeping function to ensure that any and all
> scientific testimony or evidence admitted is not only
> relevant, but reliable. *State v. Chauvin*, 02-1188
> (La.5/20/03), 846 So.2d 697. To assist the trial courts
> in their preliminary assessment of whether the
> reasoning or methodology underlying the testimony is
> scientifically valid and can properly be applied to the
> facts at issue, the Supreme Court suggested the
> following general observations are appropriate: 1)
> whether the theory or technique can be and has been
> tested; 2) whether the theory or technique has been
> subjected to peer review and publication; 3) the
> known or potential rate of error; and 4) whether the
> methodology is generally accepted by the relevant
> scientific community. *Daubert*, 509 U.S. at 592-594,
> 113 S.Ct. 2786, 125 L.Ed.2d 469. In *Foret,* supra, the
> court adopted these observations as a helpful guide for
> our lower courts in considering this difficult issue. *Id.*
> Thus, Louisiana has adopted *Daubert's* requirement
> that in order for technical or scientific expert
> testimony to be admissible under La.Code Evid. 702,
> the scientific evidence must rise to a threshold level of
> reliability. *Daubert's* general "gatekeeping" applies
> not only to testimony based upon scientific
> knowledge, but also to testimony based on "technical"
> and "other specialized knowledge." *Kumho Tire Co.,*
> *Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143
> L.Ed.2d 238 (1999); *Independent Fire Ins. Co. v.*
> *Sunbeam Corp.*, 99-2181 (La2/29/00), 755 So.2d 226.
> The trial court may consider one or more of the four
> *Daubert* factors, but that list of factors neither
> necessarily nor exclusively applies to all experts or in
> every case. *Id.* Rather the law grants a district court
> the same broad latitude when it decides how to
> determine reliability as it enjoys in respect to its
> ultimate reliability determinations. *Kumho, supra* at
> 526 U.S. 142, 119 S.Ct. 1167, 143 L.Ed.2d 238.

> *State v. Allen*, 41,548, pp. 11-13 (La.App. 2 Cir. 11/15/06), 942
> So.2d 1244, 1254-55.

*State v. Brannon*, 07-431, pp. 8-9 (La.App. 3 Cir. 12/5/07), 971 So.2d 511, 517-

518, *writ denied*, 07-2465 (La. 5/9/08), 980 So.2d 689.

Our review of the record indicates that it is true that the trial court provided only general reasoning to accept Clark as an expert, which is insufficient to meet the detailed requirements of the fairly recently amended La.Code Civ.P. art. 1425(F).[6] We were unable to find any *Daubert* analysis by the trial court in the record. The failure to conduct an analysis is considered a legal error. *See Robertson v. Doug Ashy Bldg. Materials*, 10-1552 (La.App. 1 Cir. 10/4/11), 77 So.3d 339, *writs denied*, 11-2468, 11-2430 (La. 1/13/12), 77 So.3d 972, 973; *Arceneaux v. Shaw Group, Inc.*, 12-135 (La.App. 1 Cir. 9/24/12), 103 So.3d 1086, *writ denied*, 12-2732 (La. 3/1/13), __ So.3d __. Thus, we must conduct a de novo review of Clark's testimony.

The hearing in which Clark's qualifications were supposed to be examined took place on March 14, 2011. At this hearing many other pre-trial issues were discussed with only the following colloquy regarding Clark's qualifications taking place:

MR. ACKERMAN:

> We've got prescription. We've got No Right of Action, No Cause of Action. We've got – we haven't even touched the Motion to Exclude Ms. Clarke's deposition with all of the testimony. It's almost like we do need an evidentiary Daubert hearing to figure out what she's going to testify to. I don't think we're going to do that today.

THE COURT:

> Which I'm not inclined to exclude her testimony. I read the deposition. She's got training skills and expertise. She's got documents galore. Some of those things, I didn't fully understand, but I'm not embarrassed to say that.

> And Ms. Hollins, you say that several times. You say that I'm not following you or you just threw something new at me. And Hunter said he thought that you accused her of actually throwing something at you. I thought that was kind of comical.

---

[6] *See* 2008 La. Acts, No. 787 § 1.

11

> But I'm not inclined to throw her testimony – that's something we can defer to on the merits during the trial. I'm not going to exclude her. I can tell you that now. I think she's got data that she relied on. While I say it's confusing, it was really quite impressive how she would – you know, the things that she considered and the way she developed her opinion.

At the conclusion of the hearing, the trial court formally denied DHH's motion to exclude Clark's testimony.

After conducting a de novo review of Clark's qualifications under Article 1425(F)(4), we find that Clark was qualified to testify as an expert in business valuation, including damages resulting as a loss of market share and that her expertise assisted the jury in determining damages.

Clark has been a certified public accountant since 1979 and is also a certified valuation analyst and a certified forensic accountant. She testified that the latter two certifications required passing examinations and years of experience. Defense counsel did not cross examine Clark on any of her qualifications or question her expertise in the area.

Further, we find that Clark's testimony and use of the market share theory was reliable. Most Louisiana jurisprudence discussing market share deals with claims involving monopolies. Establishing a market share for the purpose of showing a competitor's monopolization of the industry is frequently litigated. Market share in terms of business valuation has been the subject of litigation, and the term "market share" is easily understood. In *Pelts & Skins Export, Ltd. v. State through the Dep't of Wildlife & Fisheries*, 97-2300 (La.App. 1 Cir. 4/1/99), 735 So.2d 116, *writs denied*, 99-2036, 99-2042 (La. 10/29/99), 748 So.2d 1167, 1168, some of the plaintiff's damages were assessed using a lost market share analysis that was based upon the percentage of tags issued to the plaintiff for its alligator

skins.  In the context before us, we find that the accounting practice of determining a company's market share is a reliable methodology in the accounting world.  Moreover, Clark described how MCGC's market share was determined and valued in minute detail.

DHH next argues that Clark's calculations were flawed.  Based on our review of Clark's testimony, we disagree.  Loss of profits is a compensable damage that need only be proved by reasonable certainty.  *Pelts & Skins Export, Ltd.*, 735 So.2d 116.  DHH claims that Clark's calculations were "speculative and based on unsubstantiated assumptions and conclusions."  The majority of DHH's argument centers around the attached versus detached tanks issue, in essence arguing that Clark should not have considered the market share of residential ATUs with attached pump tanks.  We find no error in Clark's calculations that considered both attached and detached pumps as described further below.

Next, DHH claims that future lost profits could not be awarded for a twenty year period.  We note that the jury form did not specifically list a section for "future lost profits" but instead "loss of business reputation."  Additionally, the jury's award for loss of business reputation is substantially less than the estimated future damages that Clark testified to.  Finally, DHH argues that Clark failed to consider MCGC's subsidiary companies. We disagree.  The jury assessed the testimony regarding damages and made its own conclusions based on all of the factors before it.  Based on all of the evidence before us, we find no error in the inclusion of Clark's testimony on these various issues.  The issues pertaining to the appeal of the actual damage awards will be discussed below.

*Louisiana Sanitary Code/Selective Enforcement*

*Louisiana Sanitary Code*

13

Here, DHH essentially argues the merits of the case. First, it argues that neither the trial court nor the jury decided the fundamental question of whether Section 729 of the Louisiana Sanitary Code applied to residential treatment plants (MCGC's position) or whether Section 725 applied to residential treatment plants with attached pumps and Section 729 applied to residential treatment plants with detached pump tanks. MCGC argues that the jury made this factual determination. We agree.

The bulk of the substantial testimonial and documentary evidence presented at trial pertained to the application of Section 729 of the Sanitary Code. DHH cannot now argue that this legal question was not determined by the jury when it specifically noted that it was an issue for the jury to decide. After MGCG's counsel moved for directed verdict on the issue of Section 729's application, counsel for the state stated: "And the Code itself is so in-artfully drawn that it is subject to multiple interpretations. It's up to the Jury to look at that and see what their interpretation of it might be, in relation to Murphy Cormier." Later DHH's counsel stated: "And you have heard two manufacturers show how they interpreted it differently. And it made rational sense, at least to me. And that's up to the Jury to decide if it makes sense to them also." Moreover, the record is replete with evidence supporting the jury's finding as noted in the witness testimony reviewed below.

*GEORGE ROBICHEAUX*

Robicheaux, a DHH employee for the past thirty-nine years, has been a licensed civil engineer since 1977. For over twenty-five years, he has performed sewage program manager work for DHH. He was involved in the rewrite of the Sanitary Code under the chairperson of the committee, Russ Radar, the former

14

chief engineer of DHH.  Robicheaux testified that Cormier was asked to serve on the committee, which began working in the late 1980s and continued working through the 1990s.

Robicheaux testified that it was his opinion that Section 729 applied to both attached and detached pumps of residential units.  He said that Section 729 specified minimum tankage capacity requirements.  Thus, the pump tankage requirement depended on the size of the treatment unit that amounts to 10% of the average daily design flow of the treatment system (the pump on level) plus 10% of the average daily design flow of the treatment system (high water alarm level) pursuant to Section 729. Further, "a reserve volume may be provided between the 'high water level' and the invert of the inlet pipe to the holding tank, if so desired." Thus, a 500 gallon residential unit would require a 100 gallon pump.  Robicheaux said that the purpose of the pump (sometimes called a lift chamber or pot belly) is to assist the gravity flow of waste materials leaving the home.  He said in recent years that the pumps also supply disinfectant via chlorine or other chemicals.

Robicheaux next discussed the treatment plant itself, which has to be certified by a third-party such as the NSF. He said that the NSF will not inspect a detached pump station and will generally not inspect an attached pump station except as it relates to the structure of the treatment plant.  Robicheaux testified:

> Q. So if Murphy Cormier General Contractors is going to comply with the law and has a 500 ATU system with a pump tank, whether attached or detached, but he's got chlorine in his pump tank, he has to have 130 gallon capacity, doesn't he?  He has to meet the ten and the ten, and he has to have a reserve for the chlorine; am I correct?
>
> A. That's the way that I would view it, if I were a manufacturer, in terms of meeting the Code requirements.

Robicheaux went on to state that it was "abundantly clear that those percentages were specified as such because of the need to consider variations in sizing of tankage," i.e., 10% of gallon unit. He said that it was DHH's job to enforce the new requirements of the law. Robicheaux testified that he became involved when Cormier began complaining that the rules were not being enforced against his competitors. Robicheaux said that his subordinate, Julie Fourrier, an engineer, was investigating Cormier's complaints. A May 1, 2007 letter composed by Fourrier, to Karen Irion, Chief Engineer of DHH, was submitted into evidence. In the letter, Fourrier requests guidance on how to proceed following an inspection of the pump chamber of Cormier's competitor that did not meet the requirements of the Sanitary Code.

A September 11, 2006 letter from Fourrier to Irion indicated that Fourrier and another DHH employee, Tom Walton, inspected the Cormier tanks and used a flow meter to measure how many gallons the various pump chambers were. She noted that before the Sanitary Code revisions his tank was 42 gallons; after the revision his tank was 133 gallons, and his competitor's tank (which Cormier had purchased two years prior) was 58 gallons.

A May 7, 2007 letter from Irion to Cormier's competitor, John Pomier of American Wastewater Systems, Inc., was submitted into evidence.[7] The letter notified Pomier that his B.E.S.T 1 AWS – 500 model was not in compliance with the Sanitary Code and that corrective action was required to increase the pump chamber capacity to 100 gallons. However, Robicheaux testified that this letter

---

[7] The record indicates that the letter was drafted by Fourrier for Irion's signature, but it was never signed by Irion.

was never mailed to Pomier, in his opinion, because Pomier was a life-long friend of Stanley Clause, a DHH employee.

Robicheaux next discussed some letters composed following a meeting in which Irion and Cormier were present. Robicheaux said that Irion agreed with Cormier that field sanitarians were not enforcing the Sanitary Code. Robicheaux opined that DHH knew that Cormier was complying with the Sanitary Code while others were not based on discussions he had with Irion, Fourrier, and the state engineering board.

However, after Cormier filed suit, Robicheaux testified that he remembered Irion saying that she would put Cormier out of business. Robicheaux related that Irion began sending out emails in an attempt to shut down Cormier by gathering evidence buttressing her position regarding commercial systems that only two-and-a-half-inch or three-inch pumps were an acceptable size; Cormier used two-inch pumps. Robicheaux testified that two-inch pumps had been approved by the state for more than twenty years in all regions by Chief Engineers before Irion. He said that numerous two-inch pump plans were approved under Irion prior to her decision to require a two-and-a-half to three inch pump. Robicheaux described Irion's actions at the time as "quite an abrupt departure. It was with much fanfare and with point of acute interest that we assisted on this issue of the two and two-and-a-half inch pump."

Robicheaux next discussed the "trash trap" design of Cormier's commercial sewage treatment system. The "trash trap" is a pre-separation or a pre-treatment mechanism used in a commercial sewer treatment system. Robicheaux said that Irion filed a notice of intent to change the regulations in 2010 to require a two-and-a-half-inch pump or grinder in equalization units. Cormier stated that his opinion

17

was never sought and he viewed it as "an attempt to clarify the issue that was evolving on the basis of the complaint and litigation."

Robicheaux further testified regarding DHH's promise to Cormier that he would be allowed until March 31, 2001, to get rid of his inventory that would no longer meet the Sanitary Code. He recalled attending a meeting of the Governor's task force and overhearing the conversation Cormier had with Dr. Guidry in which Cormier was told that he would have until March 31, 2001, to get rid of his inventory. He stated that Cormier's attorney was present at the time and had specifically indicated to Dr. Guidry that more time would be needed. When questioned whether the state reneged on that promise, Robicheaux responded affirmatively.

Robicheaux further discussed the complaint filed by Irion against Cormier with the Board of Engineering, claiming that Cormier was practicing engineering without a license. Robicheaux recalled Irion speaking about it, and he stated that "she was proud of the fact that she and others had done that." Robicheaux discussed the fact that Irion was operating a personal consulting business out of the DHH office; that the Louisiana State Police seized various equipment from her; and that she was dismissed from her duties.

Robicheaux testified that a February 28, 2001 letter sent by Cormier's former attorney, James C. Percy, to Dr. Guidry, referenced the conversation Robicheaux overheard in which Dr. Guidry said Cormier would have until March 31, 2001, to have his treatment systems be in compliance with the Sanitary Code.

Robicheaux also discussed a letter sent to Cormier that was written by Doug Vincent, Chief Engineer, but signed by Dr. Guidry, informing Cormier that he could not sell the smaller tanks and would not be granted an extension. However,

18

that letter was not submitted into evidence because it was missing. Robicheaux said that Irion ordered him to bring her twenty-four boxes of records when they transitioned from one building to another and that he "did observe her effectively destroying the records, putting them into–in the 'to be trashed' pile, summarily. Twenty-four boxes, legal, all principally containing the Chief Engineer's records. And those were the ones that that letter that you, I think, are referring to, likely would have been in." Robicheaux further discussed the letter, noting that he was the custodian of the records when Vincent was the boss. He stated that once Vincent was dismissed for cause, he became the effective custodian and that once Irion assumed Vincent's responsibilities, she ordered him to bring her all of Vincent's files, "as she expressed it, to cull them, to clean them out because going forward–and these were her words–business would be conducted on her basis, not his, as she decided, not as he decided."

Robicheaux then discussed a September 26, 2006 letter sent to Mr. Cormier by Fourrier.[8] The letter advised Cormier that all pumping stations must be in compliance and that inspections would be forthcoming. The letter states in pertinent part (emphasis added):

> The particular requirements for pumping stations can be found in the Louisiana Administrative Code (LAC) Title 51, Part XIII, Chapter 7, Section 729 which is available for download at http://www.dhh.louisiana.gov/offices/publications.asp?ID=206&Detail=928 This section applies to **any pumping station that is attached by incorporating the chamber in the mold or fabrication process to the individual mechanical plant or manufactured as a separate, detached tank.**

Robicheaux again stated that when the Sanitary Code was implemented in 2001 there was no doubt that Section 729 applied to attached and detached pumps.

---

[8] The certified mail return receipt evidencing that Cormier received the letter is included in the record.

19

Robicheaux testified that the letter merely reinforced what everyone already knew regarding the application of the Sanitary Code to both types of pumps. Further, he stated that the letter would not have been sent out without all supervisory staff concurring on its contents.

### *JULIE REED FOURRIER*

Fourrier testified that she began working for DHH in 2002 and worked under the supervision of Robicheaux. She discussed her investigation into Cormier's complaints that residential sewer treatment plants were being sold that did not comply with the Sanitary Code. She agreed that residential sewer plants were being sold that did not comply with the Sanitary Code as Cormier alleged.

Next, Fourrier reviewed a follow-up letter regarding the measurements that were taken at Cormier's yard on August 6, 2006. The September 19, 2006 follow-up letter Cormier sent to her essentially asked what she was going to do about the selective enforcement of the Sanitary Code by DHH now that she had seen it with her own eyes.

Fourrier then discussed the missing letter in which Cormier was informed that he could not sell the forty-two gallon tanks and would not be granted an extension. She confirmed that the letter was authored by Vincent but signed by Dr. Guidry. Fourrier further testified that Irion had disposed of many documents.

Fourrier said that after she conducted her investigation, Irion told her to prepare a letter to send to the manufacturers. Fourrier confirmed that she authored the September 26, 2006 letter stating that Section 729 applied to both attached and detached pumps. She further confirmed that the pump chamber had to have a "ten percent and a ten percent working capacity to compare to the amount of the treatment plant[,]" meaning that 10% from the bottom of the tank to when the

20

pump kicks on from the float, and then, 10% from that point to the high-water alarm mark. Thus, a 500 gallon tank requires a pump tank (attached or detached) with 100 gallons. She agreed with Robicheaux that extra space for chlorine was necessary, accounting for the extra thirty-three gallons that Cormier has in his pump tank.

Fourrier said that Clause and Cambre knew about the September 26, 2006 letter before it went out. In the letter, manufacturers were given two options: submit plans and specifications or inspection of their system. Fourrier said that American Wastewater (Pomier) was first on the list for inspection and that it failed the inspection as its pump tank was in violation of the Sanitary Code because it was too small. She said that National Wastewater refused to allow her to conduct her inspection. She drafted the cease-and-desist letter to American Wastewater, and "then after that, everything fell apart."

Fourrier discussed her May 1, 2007 letter to Irion informing her of American Wastewater's violation. This letter was circulated to Cambre, Clause, Robicheaux, and Vincent. Next, Fourrier drafted the May 7, 2007 cease-and-desist draft letter that she prepared for Irion's signature. Fourrier said that despite Irion agreeing with her that American Wastewater was in violation of the Sanitary Code, the cease-and-desist letter was never issued to American Wastewater. She said that she gave it to Irion to proceed up the proper channels, but she did not know what happened after that. Nevertheless, Fourrier testified that American Wastewater's license was renewed in 2008, 2009, and 2010, even though it was violating the Sanitary Code. When questioned if it was clear to her that the state was selectively enforcing the Sanitary Code, Fourrier answered affirmatively. She stated that she felt it was unfair that Cormier could not get a straight answer from DHH and had

21

to proceed with a lawsuit. She noted that she could not get a straight answer from her superiors, either.

Regarding Cormier's commercial systems and the two-inch metering pump, Fourrier said that any time Cormier's name came up, Irion "would get flustered and would not speak highly of him." She also knew that his design had been approved by four previous engineers for more than twenty years, but that Irion was going to prevent it.

Fourrier testified that although Section 729 historically applied to both attached and detached pumps, the state then attempted to take the position that Section 729 did not apply to an attached pump chamber. She stated: "Well it did. Then it didn't. Then they had no answer."

Fourrier said that she never denied any permit based on whether a pump was attached or detached. She also said that through the time she left, permits had been approved regarding residential treatment plants with attached pump chambers of less than a hundred gallons.

Regarding commercial units, Fourrier said that the two-inch pump is in the equalization portion of the treatment plant and not in the pretreatment process. The two-and-a-half or three-inch requirement has to do with raw sewerage. Fourrier testified that Irion twisted the rules in order to deny Cormier permits on his commercial units.

### GLENN CAMBRE

Glenn Cambre, a lawyer, started working for DHH in 1999, and was the Executive Director of the Center for Environmental Health Services for the Office of Public Health, which oversaw sanitarian services, engineering services, the

section of environmental, epidemiology, and toxicology and drinking water at the time of trial.

Cambre reviewed an October 6, 2006 letter that he sent to DHH Attorney Supervisor, David McCay, requesting advice regarding Cormier's claims. Cambre testified that he stopped the cease-and-desist letter from going out to American Wastewater because it was improper procedurally.

Cambre also notarized Irion's signature in the complaint against Cormier with LAPELS for practicing engineering without a license. Cambre was Irion's supervisor at the time and was aware of her complaint with LAPELS. He said that the complaint was Irion's idea, but that he did not override it. He testified that he was aware that the engineering board dismissed the charges against Cormier.[9]

Regarding Irion's decision not to allow Cormier's commercial sewer treatment designs that used a two-inch metering pump in the equalization process—Cambre said that the issue came up, and he was aware of it. He then discussed numerous locations all over the state in which Cormier had installed these systems, after approval by local engineers for DHH, with two-inch metering pumps.

Cambre next discussed a June 21, 2010 letter that he composed to Cormier which is reproduced here:

> RE: Required pump sizes in commercial sewage plant equalization basins
>
> Dear Mr. Cormier:
>
> I have received and reviewed your letter to me dated June 11, 2010, wherein you request an Administrative Appeal regarding your

---

[9] A letter was sent on September 30, 2010, from LAPELS determining that insufficient evidence existed against Murphy Cormier General Contractor, Incorporated, for a violation of the board's statutes or rules.

contention that LDHH's requirement of minimum 2.5 (inch mark) pumps (or, alternatively, grinder pumps) in equalization basins is legally impermissible. I have sought input from our legal department, and they advise me that the Louisiana Division of Administrative Law, which hears all Administrative Appeals related to the Office of Public Health, has no jurisdiction to hear or issue a ruling on such an abstract question, which essentially constitutes a request for Declaratory Judgment.

I reiterate and maintain LDHH's previously stated position that we are on firm legal footing in requiring 2.5 pumps in equalization basins. LDHH has imposed this requirement statewide for many years, and any instances where it was not required for MCGC's commercial plants represent either insubordination or oversight on the part of LDHH personnel. We also believe that this requirement is well supported by various provisions in the *Ten-State Standards*. Nevertheless, in the interest of removing any ambiguity and providing absolute clarity on the issue, we have drafted a Notice of Intent ("NOI") to appear in next month's edition of the *Louisiana Register*. A copy of the NOI is enclosed herewith. We believe that enactment of this new rule should effectively resolve and put an end to this issue.

Cambre denied that all of the engineers who approved all of the units installed over the last twenty years with the two-inch grinder were fired for their insubordination or oversight. However, he said one of them was no longer working for the state, but three who had approved many of Cormier's two-inch grinders still worked for Cambre.

Cambre was questioned if he knew Irion was arbitrarily enforcing something that was not part of the law against Cormier, to which he responded that he knew she did not like Cormier's design even though the design had been used for more than twenty years. Cambre admitted that DHH withdrew the proposal following a hearing, and the law requiring three-inch metering pumps was never passed. However, the following exchange occurred:

Q. They're denying the permits when there's no law on the books rationalizing them doing it; am I correct?

A. You are correct.

24

Q. You can explain now, Mr. Cambre.

A. The engineers who are reviewing these plans can explain what they're doing. I'm not an engineer. I'm not going to try to give you the explanation.

Cambre was questioned as follows:

Q. Would it be correct then to say that as the head of the department, you had a question in your mind as to whether or not 729 applied to an attached pump chamber as of the date of the letter to your attorney?

A. Yes, sir.

## C. RUSSELL RADER

Rader, a licensed professional civil engineer, was the Chief Public Health Engineer for DHH from 1991-1997. He was qualified as an expert in civil, environmental, and sanitary engineering with a sub-expertise in the 10 States Standards of the Louisiana Sanitary Code. Rader chaired the committee to rewrite that portion of the Sanitary Code dealing with sewage treatment plants, which he described as being in turmoil. He stated that both Robicheaux and Cormier participated in the rewrite of the Sanitary Code. The rewrite of Chapter 13 was completed by mid-1997 before he left to work in West Virginia.

Rader was asked if "the State was selectively enforcing or arbitrarily enforcing the Louisiana Sanitary Code of 2001 to the detriment of Murphy Cormier?" He was of the opinion that the Sanitary Code was being selectively enforced. Rader testified:

> Total inconsistency and being singled out to go after for whatever reason. And especially going over the fact that the agency didn't know what to do when something was wrong; ignore it. You know, it's like cheese. Got to cure. Sit there, let it sit there a while.

> And the comments by the former Chief Engineer, Karen Irion, was [sic] obviously pointed. It wasn't pointed at industry. It was pointed at one person, and you don't do that. That's a good way to end with big problems.

25

Consistency with everybody. Don't point out one person as a problem.

Next, Rader was asked his opinion as to whether there was arbitrary treatment by DHH with respect to Cormier's commercial sewer treatment plant design. He stated as follows:

> My opinion, based on ANSI requirements, 10 States Standards and Louisiana State Code that the agency was going out and beyond the policies and procedures and approved policies. The State has a system set up that where a policy goes through, is signed and worked its way up through the channels. Goes to State Health Officer. It's signed off on and given a number. And that is the policy and guidelines. It's not what I want. It's not what two or three district engineers or sanitarians want. It's what the agency through the State Health Officer allowed.
>
> In one of my letters that I sent out was the fact I had checked with our legal counsel. And the only two things enforceable are what's in 10 States Standards and the Sanitary Code. Policy memos were basically guidances. Anything else written was just off-the-wall and not acceptable because we had some engineers that try to use minutes of previous meetings. Oh, this is what we all want to do. I'm sorry. That not [sic] what the Code and what legal says.

Regarding Cormier's use of the two-inch metering system in his commercial systems, Rader said the two-inch metering pump was approved throughout his tenure and four others before him and further:

> All of us [were] very consistent in what we felt that flow equalization in the commercial plants should be capable of passing two-inch solids because it was not addressed flow equalization, in 10 States Standards as to the pump sizing. It was basically what had been done here. We had probably better than a twenty-year track record that these two-inch metering pumps of flow equalization in commercial plants worked and still continues [sic] to work.

Rader said that both attached and detached pumps must meet the Sanitary Code requirements. He said that compliance with the Sanitary Code is required by law. Rader also noted that the 10 States Standard requiring a three-inch metering

pump applied to raw sewerage only. He said that Cormier's design pre-treated the raw sewerage via its trash trap, which then leads into a flow-equalization tank.

Rader reiterated that Section 729 applies to pumping stations whether attached or detached. Rader said that Cormier's design met the 10%/10% mandatory requirements of the Sanitary Code ("shall") and that Cormier's design used the discretionary portion between the high water alarm and the inlet valve for the chlorine, thus the extra capacity. Rader stated that Cormier complied with the amendments to the Sanitary Code, while some of his competitors did not.

## *MURPHY CORMIER*

Cormier testified that he started his business manufacturing sewage systems in 1978 and has testified as an expert on behalf of the state in enforcement actions. He said that he was on the committee that amended the Sanitary Code, especially Section 729. Cormier said that when he served on the committee, it was well understood that Section 729 would apply to attached or detached pumps. Cormier said at the time the Sanitary Code was changing he knew it would affect him and that he would have to build new and larger forms to comply with the 10%/10% requirement. He said that the new design was put into place to prevent sewerage back-ups in people's homes. Prior to the 2001 revisions, Cormier had been manufacturing the smaller forty-two gallon pump tank.

Cormier testified that his competitors were not complying with the new regulations. He said that DHH assured him they would investigate and enforce the rules against everyone. However, that was never done. Cormier testified that he made many complaints with DHH. Finally, he said Fourrier came out to investigate his claims. He described showing her his competitor's tank and the

27

flow meter test he used to show that his competitor's tank was a little less than sixty gallons.

Cormier described how his business operates. He said that he recruits submanufacturers around the state to build his tanks, as it would be cost prohibitive to ship them due to their weight. He also recruits the installers to put the tanks in for new homeowners. Cormier said his market share was steadily declining as submanufacturers and installers were able to buy the much cheaper, smaller tanks that were not complying with the Sanitary Code. Cormier's competitors were not installing the high-water alarms, the controls in the pump tanks, or building them to proper size.

Cormier testified about a meeting he had with Cambre and Irion. He said that he asked for Fourrier and Clause to attend the meeting but that Irion told him that she could handle it. Cormier was assured that immediate action would be taken. Cormier said the situation only worsened over the next year, and he was forced to file suit again in July 2007.[10]

Cormier stated that after Irion's deposition was taken and it was discovered that she was operating a business on the side, she turned against him and started in on his commercial units. Cormier described the delays in getting permits. He said it normally took thirty to forty-five days to get a permit, and then suddenly it started taking him a year because DHH would deny the permit and send back further random requirements based on "unwritten policies." He said that eventually DHH told him he could not use the design he had used for the past twenty years. Cormier testified that he was forced to change his commercial

---

[10] Cormier previously filed suit in 2002 against DHH and two of his competitors regarding the same claims. He dismissed the suit after assurances by DHH that it would enforce the Sanitary Code.

systems to use grinder pumps, even though he knew it was going to give inferior treatment to his customers.

Cormier next described his long-standing business relationships with engineers and contractors throughout the state. He said that few want to work with him due to the delays in permitting and because his reputation has been damaged. He testified that he had seventy-six employees, which dwindled to twenty-five to thirty due to the loss in business. He said MCGC's market share of residential units used to be 50%, and now it is not doing a third of the business that it used to. Regarding commercial units, Cormier said that engineers refuse to do business with him until the matter is settled. He said that he has lost millions of dollars in business because of the selective enforcement and misapplication of the law on the commercial sewer systems.

Cormier then discussed the attempted change in the law to require a three-inch metering pump and the State's eventual withdrawal of their request to change the law. However, Cormier testified that even though the law was not formally changed, DHH is still requiring that he use grinder pumps in place of the two-inch pumps he formerly used. Cormier then described seven different projects that he completed for the state of Louisiana with two-inch non-aerated trash trap pumps.

Cormier next discussed the March 1, 2001 versus March 31, 2001 implementation of the new rules. Cormier admitted that he did not receive permission in writing from Dr. Guidry to extend the deadline until March 31, 2001, and he knew as of April 2000 that Vincent of DHH was protesting the extension.

*TREY ALEXANDER*

Alexander, a professional engineer, testified that he has worked at Associated Design Group since 1996. Associated Design Group is comprised of

mechanical and electrical engineers who mostly design mechanical and electrical systems for commercial buildings. Alexander said that Associated Design Group used MCGC for mechanical sewer plants for many years and that Cormier had a reputation for providing a quality product that he stood behind. Alexander said that he reviews successful bids to make sure they meet code and standards and then submits documentation to DHH for review in order to get a permit.

Alexander described an incident involving a school project in which DHH wanted a change in the design, specifically aeration of a trash trap to reduce odors. Cormier believed it was a bad design because it causes particles to lift and float into the tank. Alexander said Associated Design Group backed out of the project rather than get in the middle of a dispute or be held responsible for a design that did not work properly. However, he testified that he thought both sides had valid arguments over whether trash traps had to be aerated.

## GARY SCROGGS

Scroggs, a professional engineer since 1974, testified via videotaped deposition. He said that he worked with Cormier since 2005 doing contract work and had completed about twenty projects for Cormier. Scroggs would receive a design summary package from Cormier, and he would verify that everything was according to standard and affix his professional stamp to the drawings and plans. Scroggs said that normally when he had to interact with DHH, the questions or comments to proposed plans were predictable and that they were easy to work with. However, he said that DHH suddenly started denying formerly approved items and that DHH was "off-base" and "blockading" the progress of the projects. He said DHH was inconsistent and changing the rules for no reason.

Scroggs described a particular job in Jena, Louisiana, in which a DHH representative out of Alexandria, Chris Soileau, demanded a non-climbable fence that would have been flat panels of metal at an astronomical cost when six-foot chain link fences were commonly used throughout the area. He further described detailed questions that were posed before the project could be completed that were never required before. He described other situations in which random and arbitrary requirements of substantial cost were imposed on MCGC by DHH. He said Cormier's projects were significantly delayed due to these extra requirements.

Scroggs testified that he was affected personally as an engineer because his reputation was being questioned. He said that there were allegations that he was "rubber-stamping" Cormier's designs, which he denied. He said that eventually he received a letter from the Alexandria office of DHH requiring responses on a letterhead. At the same time, Scroggs said he formed a company, Hummingbird, in order to shield himself personally from liability. He said thereafter that DHH filed a complaint against him for practicing engineering in the state of Louisiana without having registered Hummingbird. He said that he paid the fine for not having Hummingbird registered, but that the charges against him personally were eventually dropped. Scroggs testified that the problems escalated and worsened as he continued to work for Cormier. He said that he will no longer accept projects from Cormier in the Alexandria area and has, in fact, turned down projects due to the unwarranted scrutiny of the DHH office. However, he testified that he had no idea if other manufacturers were experiencing similar inconsistencies.

*BRANDON DUOS*

Duos, a professional engineer since 2009, was employed by ReCon Engineering (ReCon). Duos testified that he provided the engineering consulting

services on a project at a local school in which Cormier won the job. Duos said that he had never worked with Cormier before, but that Cormier's reputation at ReCon was good, and that the installation of the sewer system at the school was expected to be routine.

Duos described that from the outset of the project, there was a problem with the pump. He said DHH wanted him to use a grinder pump, which was not made for his design. Duos said that his investigation into the 10 States Standards and the Sanitary Code revealed that raw sewage requires a two-and-a-half inch pump but that Cormier's system pre-treated the sewage thus not requiring a grinder. Duos opined that Cormier's plans met the intended design and were fine. However, he said that DHH would not approve the plans and continued to raise trivial issues. He said that dealing with DHH was "cumbersome." For instance, Duos said DHH would ask for information that had already been provided.

Duos further testified that "it was actually very comical at times because I was looking at it at my desk and saying, wow, we tried to make an attempt to accommodate something that, in my expertise, it was not something you would want to do." He said that there was a lot of "back-and-forth" on trivial issues that just delayed the job. Duos testified that this happened repeatedly even though he was sure every time he would send the paperwork back that the permit would be issued. Instead, DHH would mail a new response with more questions three-to-four weeks later despite his requests to email, phone, or meet in person in order to speed up the process. Finally, Duos said that DHH's requests caused him "to go outside of the preferred methods of how we would normally want to do this type of work." In fact, he testified that in his opinion, DHH's requests were contrary to good engineering design.

32

## TODD CORMIER

Todd Cormier, Murphy's son, testified that he became officially employed by MCGC in 1991. At the time of trial, Todd was the Vice President and General Manager of MCGC. Todd discussed some of the substantial changes that MCGC had to make once the new Sanitary Code went into effect to accommodate the larger pump tank size requirements. He discussed the reduction in business over time based on the "pour schedule" (of the molds) that went from six days a week to two days a week. He testified to the loss of the installers that occurred because they continued buying smaller, cheaper tanks from MCGC's competitors. Todd said that commercial units had always been approved with the two-inch pumps and then suddenly DHH wanted a grinder. He said that the grinders are high maintenance and have to be serviced every six months. He then discussed the issue regarding aeration of the trash trap and said that aerating the trash trap would stir up the solids and not let them fall out, defeating the whole design of the system.

Todd then discussed the job involving Trey Alexander. Todd said Alexander declined to do the work after all of the previous problems they encountered with DHH. He discussed various jobs in which permits had been substantially delayed sometimes for more than six months, usually citing the grinder pump or three-inch pumps as the reason.

## JONATHAN CAUSEY

Causey was the Chief Engineer for DHH at the time of trial. He testified that he oversees three major programs: the safe drinking water program; community sewage program; and the operator certification program that certified water and wastewater operators. Causey said that he does not oversee residential

33

sewage treatment centers at all, as that section was moved to the sanitarian services section.

Regarding commercial units, Causey said that he began working under Irion in 2006 and eventually took over her position when she was dismissed. Causey said that he became aware of Cormier's dispute with DHH in disallowing his two-inch equalizer pumps. Causey said that it was his job to interpret the Sanitary Code and that it was determined at the time:

> That wastewater, that is in an equalization basin, is you know, for what projects and applications that were presented to us at the time, was of the same character quality as raw wastewater. And therefore, the pump requirements applicable to raw wastewater would also be applicable [to] wastewater in these equalization basins prior to receiving treatment.

Causey said that the 10 States Standards references a three-inch solids passage pump with four-inch discharge for pumps handling raw wastewater. However, he said that DHH historically accepted two-and-a-half inch solids passage pumps.

Regarding trash traps, Causey said he had never heard of one until shortly after Hurricanes Katrina and Rita, when some were used for FEMA trailer parks. He said they are not addressed in the 10 States Standards or the Sanitary Code. Causey testified that his office has historically handled trash traps based on Rader's old memo but that he personally does not "really see much function that it has." However, he was willing to accept it if the trash trap design was felt necessary by the engineer who was designing the system, but only if the trash trap was aerated to prevent septicity of wastewater. He said that this policy is not in writing, but he would require that the trash trap be aerated in any projects presented to him

34

Regarding extended time for obtaining permits, Causey said that the changes had been statewide due to turnover in engineers and "a lot of problems, in this area, regarding things that had been approved by the original engineer I spoke of, that did not meet Code. . . . [H]e was enforcing the Code on plans, not enforcing the Code during sanitary surveys, and that is still causing us problems today." Causey further attributed the permitting delay to increased regulations, increased work load, and decreased work force. He said that DHH is attempting to have consistency statewide and implementing new software tools.

On cross-examination, Causey was questioned about the complaint he filed against Scroggs with LAPELS. He was not aware that the charges against Scroggs, individually, were dropped. Causey was then questioned about a July 23, 2009 email sent to Irion that was submitted into evidence. In that email, Causey informed Irion:

> I spoke with all our Regional offices to verify what pump criteria they were using for pumps in equalization basins. The conclusion was that they were in fact applying the pump requirements in Ten State Standards for lift stations (2.5" solids passage or grinder pumps) to equalization basins when pumps were proposed to transfer raw wastewater from the eq chamber to the aeration basin. There were some eq basins such as in the Region 1 area that was just gravity flow from the eq basin to the treatment unit.

In fact, Causey admitted that the 10 States Standards required three inches, but he said that DHH allowed two-and-a-half inch solids and grinder pumps on lift stations. Counsel then questioned him about the 10 States Standards and the definitions of raw wastewater to show that the 10 States Standards were being misapplied to Cormier because the section dealing with raw wastewater was separate from that area dealing with equalization basins. Cormier uses equalization basins, and no pump size is required. Causey admitted that Cormier's

two-inch metering pump in his equalization basin had been routinely approved by DHH within thirty days of requesting the permit across the state. He admitted that on the job he reviewed, a 2005 FEMA project, he personally approved the use of Cormier's two-inch metering pump.

Causey testified that he helped the DHH attorney draft the proposed rule change. He essentially testified that the law had been misapplied for the twenty years that Cormier's two-inch metering pump with trash trap had been approved. In fact, through 2009, 138 of Cormier's two-inch metering pumps had been approved for use in the state. Causey admitted to physically bringing Irion's complaint to the LAPELS office. However, he denied knowing the content of the complaint.

## *MICHAEL KELLY VIDRINE*

Vidrine testified that he had worked for DHH since May 1989 and was currently the program administrator for the on-site wastewater program for DHH. He began his tenure with DHH as a parish sanitarian in St. Landry Parish and held that position for ten years. He said that his department inspected residential treatment units. Vidrine said that some had pumps attached and some did not, depending on gravity at the particular location.

Vidrine became the on-site program manager in October 2010. He said that in 2010, there were about 12,000 residential systems installed. He testified that Section 729 of the code did not apply to attached pump stations. He testified that "the Code is not very clear about it, number one, and the—the—the one illustration they have on it is for a detached unit." Vidrine opined that ANSI certified units with attached pumps did not undergo further review before local sanitarians

36

because the whole unit had been already been certified by ANSI. However, he knew that ANSI did not actually inspect the pumps, only the treatment unit itself.

Vidrine discussed a memo that he sent out across the state to all parish sanitarians on March 2, 2005, that stated in part:

> With regard to an unrelated matter that came up today as well, please be advised that pump stations requirements apply only to actual pump stations, and not to pumps and pump tanks that are integral to ANSI-approved treatment plant configurations. The requirements for "off" and "on" and "high water alarm" floats which are required in pump stations, do not apply to these "built-in" pumps and pump chambers.

Vidrine testified that he does not inspect attached pump chambers, but he does inspect detached pump chambers pursuant to Section 729. Trash traps are not inspected either unless they are on commercial units greater than 3,000 gallons. Vidrine said that a checklist prepared by DHH engineers is used in the inspection of commercial units.

### *AMANDA LAUGHLIN*

Laughlin, a licensed professional environmental engineer since 2007, worked as an engineer for DHH for nine years. She initially worked in Lafayette as a plans review engineer, reviewing plans of systems over 3,000 gallons and also complaints relating to sewage systems. She said that plans had to be reviewed within sixty days of submission to the office. Laughlin noted that very few plans are approved on their first submission. Laughlin testified that any concerns about the plan are addressed in what is called a "comments letter," which is sent back to the engineer. DHH then awaits a response, and the permit is eventually issued once any issues have been addressed.

Laughlin stated that the 10 States Standards requires a three-inch solids passage, but that DHH "has had a long standing practice of allowing less than that,

37

a two-and-a-half-inch passage or a grinder pump." However, she was aware that Cormier had numerous plans approved and permitted with only the two-inch equalizer pumps. In fact, she personally had permitted two of them. However, she said it was a mistake on her part. Laughlin said that it was overlooked due to larger issues involved in the project.

She denied ever being told to obstruct or delay plans that used Cormier's units. She further stated that she had denied permits to other manufacturers using two-inch pumps in 2007 and 2009. She said that anytime she runs into a two-inch pump, in an equalization basin, she denies it or requires a two-and-a-half inch pump or a grinder.

## MICHAEL CAZES

Cazes, a professional engineer since 1974, testified that he is the regional engineer for DHH Region Six covering the central Louisiana parishes of Vernon, Rapides, Avoyelles, Grant, Winn, Catahoula, Concordia, and LaSalle. Cazes began working for DHH in 1982. He said that he reviews commercial sewage treatment plants in excess of 3,000 gallons while local parish sanitarians review systems of less than 3,000 gallons. Cazes testified that his office handled the application for permit sent in by Scroggs. He said that one of the engineers in his office who works for him, Chris Soileau, contacted Causey regarding Scroggs' alleged lack of an engineering license.

Cazes said that trash traps are optional, but if they are used, they must be aerated to reduce smell. He opined that commercial pumps require the passage of two-and-a-half inch solids regardless of where the pumps are located in the system. He said that DHH's opinion is that a two-and-a-half inch solids passage pump is the minimum regardless of whether a trash trap is a pretreatment. Cazes said he

had approved Cormier's two-inch metering pump in the past, but that it was his error due to oversight.

On cross examination, Cazes was presented with two other sites in the region that were approved with use of Cormier's two-inch pumps. Cazes did not recall one of them at all, but admitted that one was approved by Soileau. Thus, out of the three plants Cormier had installed in this region, all had a pretreatment trash trap with two-inch metering pumps.

## *KAREN IRION*

Irion, a professional engineer since 1991, testified that she was the Chief Engineer for DHH from August 2006, until June 2011. From 2000 to 2006, she was the Deputy Chief Engineer for DHH.

Irion testified that she was "vaguely familiar" with the complaints made by Cormier. She claimed to be unaware of what happened because she "stopped working on anything to do with Mr. Cormier." She denied causing delays in Cormier's permitting and denied making threats to put MCGC out of business. She explained her comments as follows:

> The answer was, I said, that the – I would nev – nothing DHH would do would – would get rid of these thousands of individual sewage systems going into subdivisions, but that DEQ was going to reduce, or put these individual systems, basically, out of business. And I might have said including systems like Murphy's, through the total maximum daily load requirements that they are putting in place. It was a general comment that, because I don't like those kind of – the way they were putting them in, you know, in groups.

> Q. So, you have a personal bias against individual residential systems?

> A. I have an engineering bias against it –

> Q. Okay.

> A. –because it's unsanitary and unhealthy. I don't like kids playing in ditches with partially treated sewage

Irion then discussed her consulting firm, KSI Environmental Consultants, which was founded in 1996. She said that she consults with industrial and commercial facilities to help them permit their air, solid or hazardous waste, and wastewater. Irion said that DHH knew of her consulting business when they hired her in 2000 and allowed her to continue her business as long as the work went to DEQ for approval rather than DHH to avoid a conflict of interest. She said that she did not consult with the manufacturers or installers of residential wastewater treatment plants.

Regarding the cease-and-desist letter that Fourrier composed for her signature, Irion did not remember seeing it or "killing it" as Robicheaux testified.

Irion admitted that she had never looked at the issue involving the application of Section 729 nor had she ever seen a detached or attached pump in person. Cormier's counsel pointed out that Fourrier's letter, stating that Section 729 applied to both types of pumps, went out under Irion's supervision. She stated:

A. Okay. I said that I don't know that 729 was written for anything, in particular, other than a–a wastewater plant, but that an engineering design would normally incorporate an on-off switch.

Q. Right.

A. That's what I said.

Q. Attached, detached, you'd have to have a –

A. It wouldn't make –

Q. – an on/off switch?

A. –any difference. If you have a pump, you should have a level switch.

Regarding commercial tanks, Irion admitted she did not know if Cormier or his competitors were complying with the law. She was then asked about the

40

deposition in which she was questioned about her consulting business. At the deposition, Cormier's counsel asked for a list of clients that Irion refused to divulge. She said "I thought it was out of bounds, a personal attack against me, and I said so."

Irion claimed that Cormier was persecuting her. She admitted never reading the rules on commercial sewer treatment. She denied having any knowledge of the issue over two-and-a-half-inch or grinder pumps in equalization basins. She claimed that she was told to stay out of the issue.

Regarding the fact that the engineers working under her stopped accepting Cormier's trash trap commercial design with a two-inch metering pump in the equalization basin after the December 15, 2008 deposition in which Irion was questioned about her consulting business, she stated:

> A. Oh, okay. I actually wasn't even aware–we had discussed it. We had been very unhappy with the design. The reason I act is when I get complaints, okay

She was asked again and stated:

> A. I did not quit accepting them because I imagine that the Regional Engineers looked at the engineering designs and, but they didn't specifically discuss that with me. And I am surprised that nobody brought it up in our every-other-month video conference, but no–

> Q. So, you're telling the Jury you never discussed his designs?

> A. We did discuss the designs. I didn't know they had refused them.

Irion claimed that Cambre made all the decisions regarding Cormier as she was instructed to stay out of it. Despite having no involvement and having no knowledge of numerous documents that circulated throughout the DHH office, Irion said she did file a complaint against Cormier with LAPELS because Cormier was having an engineer seal a plan that he did not design. However, she was

41

unaware of the outcome of the complaint.  Regarding Cambre's notarization and knowledge of the complaint, Irion said that she and Cambre had discussed it and she would not have filed the complaint without his approval.

*DANE THIBODEAUX*

Thibodeaux testified that he has a bachelor's degree of science in aquatic biology and a master's degree in environmental science and chemistry and has worked for DHH since 1990.  He is an environmental health specialist and has a registered sanitarian's license.   Since 2007, Thibodeaux was the Regional Sanitarian for Region Five that encompasses Calcasieu, Cameron, Allen, Jefferson Davis, and Bureaugard Parishes.

Thibodeaux testified that his office inspects about 90% of the units in the region and that in inspecting the mechanical treatment units in his region, they only inspect detached pump chambers.  He said that his office does not inspect attached pump chambers because they are "considered to be part of the ANSI certification."

Thibodeaux discussed complaints that his office received, including those by Cormier, regarding the size of the attached pump chambers. Thibodeaux said that he forwarded the complaints to Vidrine and Vincent.  Thibodeaux testified that "[I]t was determined that the systems were approved under ANSI certification and that these systems were not to be looked at for attached pump chambers."  He said that any applications taken prior to March 1, 2001, were allowed to be put in even if they were not ANSI approved or up to current pump size requirements.

Thibodeaux also testified regarding the system his office instituted in reviewing treatment systems.  He consulted with an engineer and developed a checklist to determine if units were meeting state standards.  Thibodeaux said there has been a tremendous increase in the comments letters issued by DHH in recent

years as DHH continues to look for ways to protect the public's health. He said he received many complaints that permits were taking too long.

Cormier's counsel then showed Thibodeaux an email string between himself and Vidrine and copied to Robicheaux, Fourrier, Vincent dated April 11, 2005. In it, Thibodeaux asked:

Hey Doug [Vincent],

I'm assisting Allen Parish with a 1500 gpd commercial technology plans review and this system is followed by what I consider a pumping station. The pumping station will discharge the treated wastewater to an approved outfall path. After reviewing the spec.'s for conformity with Louisiana Administrative Code, Section 729 (Pumping Stations) it has come to my attention this tank is substantially smaller than the required 20% of the systems treatment capacity (10% for on/off switch and additional 10% for high water alarm).

After discussing this matter with Murphy Cormier and Todd Cormier (Murphy's Son), they stated this is not a pumping station but rather a lift station following a commercial technology treatment system and the requirements are not the same. I told them I would check into this and get back with them.

I need your expertise in distinguishing between the two and if a lift station has different requirements than a pumping station please notify me of where these requirements can be found.

As always, THANKS!
Dane

Vincent's reply email stated:

Irrespective of the terminology used, there are several distinct categories of pump/lift stations, in line with the following guidelines:
1) Lift stations that are part of a sewage collection system must conform with the requirements for lift stations contained in the 10-State Standards.

2) Final Raw Water Lift Stations and effluent pumping stations serving commercial-grade plants should conform to the 10-State Standard, although, in the past, many of our offices did not force this on small plants (i.e., 10,000 gpd or less).

3) Section 729 of Part 13 applies to residential, on-site systems, and should be used as a guide in those instances where no effluent pump is included in the plant design itself, or where the pumping station is not a packaged unit (as in Section 729, B.). It is my understanding that we have not generally enforced this standard for effluent pumping stations for residential applications, but you will need to obtain input from Mike Vidrine on that.

In general, the term "lift station" is utilized when describing pumping facilities in a sewage collection system (as in #1 above), and the term "pumping station" generally refers to a facility for pumping effluent or storm water runoff.

I don't know whether what you call it makes a difference or should make a difference.

Doug

Thibodeaux nevertheless said he did understand the application of Section 729, stating that it applies to pumping stations. He said the April 11, 2005 email was referring only to a 1,500 gallon-per-day commercial system.

Based on our review of the evidence, reasonable people could readily conclude that Section 729 applied to both attached and detached pumps. The only witness qualified as an expert in the Sanitary Code at trial, Russel Rader, testified that it applied to both. Robicheaux, an impressive witness and an author of the rewrite of the Sanitary Code, testified that it was commonly understood that it applied to both. Fourrier's memo makes it clear that, as a representative of the state, it applied to both. And, even Irion testified that it applied to both. Therefore, reasonable people could easily conclude that Section 729 applied to both attached and detached pumps. Moreover, even accepting DHH's position as true that this is a legal issue improperly before the jury, a de novo review would only result in our concluding that Section 729 applies to both attached and detached pumps. It is illogical to conclude that the tankage requirements are inapplicable because the pump is attached. Additionally, it was established that NSF does not test the pump

44

in the attached units except for structural integrity as it relates to the whole system. The ultimate reason that the 10%/10% requirements exist, regardless of the whether the pump is attached or not, is to prevent back-up of raw sewerage into people's homes. Accordingly, this assignment of error is without merit.

*Selective Enforcement*

The next issue is whether the jury erred in finding that DHH selectively enforced the Sanitary Code to the detriment of MCGC pertaining to both its residential and commercial units. Again, we find no manifest error in the jury's finding that DHH selectively enforced the Sanitary Code pertaining to residential plants (i.e., by not requiring MCGC's main competitors to use larger tanks) and commercial units (by specifically delaying the permitting process and intentionally causing various other problems in granting permits to MCGC.) Substantial evidence at trial supports these conclusions. Significantly, at the time of trial, MCGC's competitors were still selling residential units that did not comply with the Sanitary Code. On the commercial end, the evidence was clear that DHH, primarily through the actions of Irion and those subordinate to her, made it their mission to delay and frustrate the permitting process against MCGC. This assignment of error is without merit.

**Detrimental Reliance/Prescription**

In this assignment of error, DHH argues that the trial court erred in applying a ten-year prescriptive period because, legally, MCGC has no claims for detrimental reliance pursuant to *Wooley v. Lucksinger*, 06-1167 (La.App. 1 Cir. 5/4/07), 961 So.2d 1228. Instead, DHH argues that a one-year tort prescriptive period applies; thus, MCGC's damages should be limited to a one year period prior to the filing of suit (July 2007) rather than back to 2001. DHH further argues that

45

based on the instructions given to the jury, it found that DHH committed a tort rather than broke a promise.  We disagree.

*Detrimental Reliance*

Detrimental reliance is codified in La.Civ.Code art. 1967 which states in part;

> A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise.

In *Suire v. Lafayette City-Parish Consolidated Government*, 04-1459, 04/1460, 04/1466 p. 31-32 (La. 4/12/05), 907 So.2d 37, 59, the supreme court stated:

> [T]he focus of analysis of a detrimental reliance claim is not whether the parties intended to perform, but, instead, whether a representation was made in such a manner that the promisor should have expected the promisee to rely upon it, and whether the promisee so relies to his detriment.

A plaintiff relies to his detriment and is entitled to recover damages when he proves by a preponderance of the evidence: "(1) representation by conduct or word; (2) a justifiable reliance in that representation; and (3) a change in position to their detriment because of that reliance." *Valois v. Village of Moreauville*, 12-486, p.5 (La.App. 3 Cir. 11/21/12), 103 So.3d 1232, 1235; *Suire*, 907 So.2d 37.

DHH relies on *Wooley*, 961 So.2d 1228, for the proposition that a governmental agency cannot be held liable in detrimental reliance for performance of its regulatory functions.  We disagree.

In *Wooley*, Health Net argued that it had a claim against the Louisiana Department of Insurance (DOI) because it relied on DOI's approval of its actions pertaining to the sale of a health maintenance organization.  After a lengthy discussion defining "promise," the first circuit declared:

46

*As a matter of law*, the actions and declarations of DOI [Department of Insurance] in following, applying and executing its statutory powers and regulatory functions are not *promises* for Article 1967 detrimental reliance and *public contract* purposes. Because there is no *promise* by DOI in favor of Health Net as a matter of law, Health Net's claim for detrimental reliance is legally nonexistent.

*Id.* at 1239.

While a claim for detrimental reliance cannot exist when the state is "following, applying and executing" its statutory and regulatory powers, that is not the case here. Furthermore, claims against governmental agencies sounding in detrimental reliance are not per se prohibited. We find the facts of this case distinguishable from those of *Wooley* because DHH specifically failed to enforce its own regulations against MCGC's competitors after numerous oral and written promises in favor of MCGC to do so. Moreover, we agree with MCGC that DHH mischaracterizes its reliance. MCGC's damages resulted from DHH's failure to enforce the Sanitary Code as it promised, thereby allowing its competitors to undercut its prices.

Again, a substantial basis of DHH's argument is that Section 729 only applies to detached pumps, thus, "MCGC's detrimental reliance claim relative to the residential sewer treatment plants is based on an alleged promise made to Murphy Cormier by DHH to apply and enforce the Sanitary Code in accordance with Murphy Cormier's interpretation of the Sanitary Code." As we have affirmed the jury's finding with regard to Section 729's application to both attached and detached pumps, this argument fails.

DHH further relies on *Showboat Star Partnership v. Slaughter*, 00-1227 (La. 4/3/01), 789 So.2d 554, for the proposition that a plaintiff incurs no injury when it does what it is legally obligated to do under the correct interpretation of the law.

The *Showboat* plaintiffs paid sales taxes under protest because the Department of Revenue had formerly told them no taxes were due. The trial court and court of appeal found that although the taxes were due, the state was precluded from collecting them because of the doctrines of detrimental reliance and equitable estoppel. The supreme court disagreed finding that "[d]etriment resulting from reliance simply has not been proved." *Id.* at 563.

The supreme court referenced the court of appeal's application of four additional factors required to invoke detrimental reliance against a governmental agency. The court of appeal found that a "somewhat greater burden may be appropriate." *Showboat Star P'ship v. Slaughter*, 98-2882, p.7 (La.App. 1 Cir. 2/18/00), 752 So.2d 390, 394, *rev'd on other grounds*, 00-1227 (La. 4/3/01), 789 So.2d 554. The additional factors include: "(1) unequivocal advice from an unusually authoritative source, (2) reasonable reliance on that advice by an individual, (3) extreme harm resulting from that reliance, and (4) gross injustice to the individual in the absence of judicial estoppel." *Id.* Even applying the more restrictive principles set forth in *Showboat*, which were included in the jury instructions, we find that MCGC met its burden of proof by a preponderance of the evidence. Cormier was given unequivocal advice from Dr. Guidry, Fourrier, and other DHH employees that he would be given an extension of time and that DHH would enforce the Sanitary Code against his competitors. Cormier reasonably relied on that advice and dropped his original lawsuit. MCGC's business suffered extreme harm including loss of substantial business and damage to its reputation such that engineering firms refused to do business with them. Finally, it would be grossly unjust to allow DHH to get away with the multiple egregious actions perpetrated against Cormier by its various employees.

48

DHH further argues that *Showboat* stands for the principle that "no detriment is incurred when the plaintiff's only identifiable injury is that it must do what it was legally obligated to do under the correct interpretation of the law." We find that principle inapplicable to the facts of this case. The fact that Cormier complied with the requirements of Section 729 has no bearing on the fact that the state did not enforce it against others. *Showboat* involved the failure to pay taxes based on a misrepresentation by the state. While it may be true that a party cannot incur detriment when its only injury is that it must pay taxes due under the law, that is not the case here. Moreover, we have found that a party relied to its detriment on the tax-related advice rendered by one its employees after considering the four additional factors set forth in *Showboat*. *See CHL Enter., LLC, d/b/a Loewer Lawn & Cycle v. State of La., Dep't of Revenue*, 09-487 (La.App. 3 Cir. 11/4/09), 23 So.3d 1000, *writ denied*, 09-2613 (La. 2/12/10), 27 So.3d 848. The facts of this case are clearly distinguishable from *Showboat*. Finally, *Showboat* affirms our previous statement that detrimental reliance claims against government entities are not prohibited as a rule. If they were, there would be no need to analyze the four additional factors.

For these reasons, there is no manifest error in the jury's finding that MCGC relied to its detriment on various promises made by DHH. First, there was substantial evidence that Dr. Guidry did indeed promise Cormier that he would have until March 31, 2001, to rid himself of his older inventory with the smaller tanks. While DHH argues that MCGC did not suffer any damages as a result, we disagree. Second, Cormier changed his position in reliance upon the promises made by DHH by dismissing his original suit filed in 2002 based on assurances of

49

various DHH employees that it would investigate and enforce the Sanitary Code provisions against MCGC's competitors.

*Prescription*

Detrimental reliance claims based in contract are subject to a ten year prescriptive period. *First La. Bank v. Morris & Dickson, Co., LLC*, 45,668 (La.App. 2 Cir. 11/3/10), 55 So.3d 815.[11] Furthermore, a promisor who lulls the promisee into a false sense of security that an action will be taken cannot avail itself of claim of prescription. *Babkow v. Morris Bart, P.L.C.*, 98-256 (La.App. 4 Cir. 12/16/98), 726 So.2d 423; *Fontenot v. Houston Gen. Ins. Co.*, 467 So.2d 77 (La.App. 3 Cir. 1985). Although we find the ten-year prescriptive period applicable to MCGC's claims, these circumstances are ones in which estoppel would lie as DHH's repeated promises to MCGC that it would investigate and enforce its code induced Cormier into abandoning his original lawsuit. DHH's multiple failures to do as it promised over many years would justify it being estopped from claiming that MCGC's action is prescribed.

*Jury Instructions*

Finally, DHH argues that the jury found that it committed a tort rather than broke a promise based on the jury instructions that were given by the trial court along with the wording on the jury verdict form. We disagree. It is true that the jury was instructed in general negligence principles, i.e., those found in La.Civ.Code art. 2315, but it was also instructed in detrimental reliance principles, including the four additional *Showboat* factors. While the jury form could have

---

[11] Notably, La.Civ.Code art. 1967 is under that portion of the Louisiana Civil Code that pertains to contracts. Scholarly interpretation of La.Civ.Code art. 1967 buttresses the argument that detrimental reliance claims sound in contract: "the new article of the Louisiana Civil Code subtracts induced reliance from the quasi-delictual field and places it where it belongs, in contract." Saul Litvinoff, *Still Another Look at Cause*, 48 La. L.Rev. 3, 27 (1987).

been more detailed, we find that the term "wrongful conduct" as used on the jury form encompasses wrongful conduct of whatever kind, including causing a promisee to rely to its detriment on promises made by the promisor. Moreover, considering the trial court's manner in instructing the jury under all of the circumstances of this case, we find no prejudicial error occurred.

The jury did not err in finding that MCGC relied to its detriment on the promises made by DHH and that MCGC's claims are subject to a ten-year prescriptive period. Accordingly, this assignment of error is without merit.

*Qualified Immunity*

DHH argues that its employees were subject to qualified immunity in the exercise of discretion pertaining to their duties, thus the trial court erred in not granting summary judgment in its favor. However, the issue of immunity was also one that the jury decided, which is subject to manifest error review. We find no error in the jury's finding that DHH was not subject to qualified immunity.

DHH claims that the evidence supports a finding that the law pertaining to Section 729 was not "clearly established," thus entitling DHH employees to immunity.

Louisiana Revised Statutes 9:2798.1 states in part:

A. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.

B. The provisions of Subsection B of this Section are not applicable:

(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or

51

(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.

Government officials are entitled to qualified immunity when performing discretionary functions. *McManus v. State of La., Dep't of Wildlife & Fisheries,* 09-1158 (La.App. 3 Cir. 3/10/10), 33 So.3d 412, *writ denied,* 10-816 (La. 6/18/10), 38 So.3d 323; *Jackson v. State of La., Dep't of Corrs.,* 00-2882 (La. 5/15/01), 785 So.2d 803. The trier of fact determines whether, under the facts of the particular case, the officials are entitled to immunity. *McManus,* 33 So.3d 412.

The supreme court explained discretionary immunity in *Simeon v. Doe*, 618 So.2d 848, 852-53 (La.1993):

> In *Fowler v. Roberts*, 556 So.2d 1 (La.1989) (on rehearing), we set out a two step inquiry, derived from *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954 (1988), to determine whether the policy-making or discretionary acts doctrine applied in a specific fact situation. First, a court must determine whether a statute, regulation or policy specifically prescribes the course of action for the employee or agency to follow. If so, there is no discretion on the part of the employee or agency and therefore no immunity. If a court determines discretion is involved, the court must then determine whether that discretion "is the kind which is shielded by the exception, that is, one grounded in social, economic or political policy." *Fowler*, 556 So.2d at 15. If it is, then the doctrine applies and the employee or agency is insulation from liability; if it is not, the employee or agency is liable for any negligence.

In reviewing the testimony at trial, a reasonable jury could readily conclude that DHH was not entitled to immunity under the circumstances of this case. First, it had no discretion in the application of Section 729, and, second, pursuant to La.R.S. 9:2798.1(C)(2), the egregious acts of its various employees, particularly Irion, was well established by the evidence. The lack of immunity of the government officials covers MCGC's residential and commercial claims.

DHH further argues that the trial court failed to instruct the jury on qualified immunity, constituting a clear error. DHH argues that the jury "never got to consider and/or determine: (1) whether the DHH employees who interacted with MCGC had an element of choice in enforcing the applicable provisions of the Sanitary Code; and (2) if any discretion was involved, whether it was grounded in social, economic or political policy." We disagree.

Louisiana Civil Code Article 1792(B) requires that the trial court instruct the jury on the law applicable to the case. On review we must determine if the trial court adequately instructed the jury such that the instructions point out the issues and instruct the jury on the principles of law to be applied. *See Adams v. Rhodia, Inc.*, 07-2110 (La. 5/21/08), 983 So.2d 798. A trial court has vast discretion in formulating jury instructions, and we will not overturn a jury's verdict if the substance of the law has been adequately conveyed to the jury. *Id.* We reviewed the jury instructions regarding qualified immunity and find no error. This assignment of error is without merit.

### Statutory Cap

In this assignment of error, DHH argues that the trial court legally erred in failing to apply the $500,000.00 statutory cap provided for in La.R.S. 13:5106 to limit MCGC's lost business reputation award, that the $2,786,977.00 award was excessive, and that the $99,560.00 commercial unit award should be set aside. MCGC successfully argued at the motion for directed verdict on the issues of the cap that the loss of business reputation award was actually an award for future loss of earning not subject to the cap. DHH argues that regardless of what MGCG calls it, it is still a general damage award subject to the cap.

Louisiana Revised Statutes 13:5106 provides in part:

53

B.(1) The total liability of the state and political subdivisions for all damages for personal injury to any one person, including all claims and derivative claims, exclusive of property damages, medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars, regardless of the number of suits filed or claims made for the personal injury to that person.

 . . . .

C. If the state or a state agency or political subdivision is held liable for damages for personal injury or wrongful death, the court shall determine:

(1) The amount of general damages exclusive of:

 . . . .

   (d) Loss of future earnings and/or support.

    . . . .

      (4) Whether there will be a loss of future earnings or support, and the amounts thereof.

Part D of La.R.S. 13:5106 defines "loss of future earnings" as follows:

(2) "Loss of earnings" and "loss of support" for the purpose of this Section means any form of economic loss already sustained by the claimant as a result of the injury or wrongful death which forms the basis of the claim. "Loss of future earnings" and "loss of future support" means any form of economic loss which the claimant will sustain after the trial as a result of the injury or death which forms the basis of the claim.

In denying DHH's motion to conform the jury verdict, the trial court stated:

The residential units loss . . . computed . . . represents past residential losses, which was computed very similarly to the commercial units loss. It was the same model, same analysis essentially done in each; and the residential units loss represents . . . lost earnings[.] . . . For that reason I find that the . . . jury award is not subject to the cap.

   Also, the loss of business reputation, the evidentiary basis upon which the jury made this award consisted of loss of future earnings evidence; therefore, not subject to the cap. That is the ruling of the Court.

54

Second, DHH argues that the damage award is excessive. Third, DHH argues that the damages awarded by the jury for the loss of sales of commercial units should be disallowed.

Special damages are those that can be determined with reasonable certainty. *Thibeaux v. Trotter*, 04-482 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128, *writ denied*, 04-2692 (La. 2/18/05), 896 So.2d 31. The plaintiff bears the burden of proving special damages by a preponderance of the evidence. *Cormier v. Colston*, 05-507 (La.App. 3 Cir. 12/30/05), 918 So.2d 541. An award of damages made by the jury is a question of fact, entitled to deference on review. *Id.* In order to reverse or modify a jury's damage award, there must be no factual basis for its conclusion, and the finding must be clearly wrong. *Menard v. Lafayette Ins. Co.*, 09-1869 (La. 3/16/10), 31 So.3d 996. It is within the jury's discretion to credit one expert's testimony over another. *Menard*, 31 So.3d 996.

## *DAPHNE BORDERLON CLARK*

Clark, a certified public accountant since 1979, has been a partner in Langley, Williams & Company of Lake Charles since 1994. She is also a certified forensic accountant and a certified valuation analyst, and she was qualified as an expert in those fields.

Clark said that she read the petition, interviewed Murphy, Todd, Troy and MCGC's bookkeeper, Charlene Aguillard. She obtained compiled financial statements from MCGC's CPA, Anthony Lebato, for the fiscal years June 30, 2000 through June 30, 2010.[12] Clark obtained information from the state and reviewed numerous depositions.

---

[12] Clark testified that most companies have a calendar year beginning January 1 and ending December 31st, but that MCGC chose their fiscal year to begin July 1 and end June 30.

Clark said that she had to perform "normalization" in order to match the fiscal year to the calendar year because the state's data was on a calendar year system whereas MCGC used a fiscal year.

Clark was of the opinion that MCGC suffered damages including past damages for the residential units beginning in 2001 through 2009 (with 2010 still pending as she awaited information from the state) and future damages and commercial damages both past and future.

In order to determine lost business, Clark obtained information from the state covering the years 1991 through 2009 that had the number of residential tags issued for treatment plants, which she compared to Cormier's records that date back as far as 1999 through 2009.

A summary of Clark's opinion of the damages suffered by MCGC was offered into evidence, and Clark testified that it was her opinion, based on her expertise to a reasonable degree of accounting probability, that MCGC had sustained or will sustain the following losses. Residential damages were summarized as follows: Past damages $4,660,846.00; Future damages $2,663,030.00, for a total of $7,323,876.00. Commercial damages were summarized as follows: Past damages $99,560.00; Future damages $484,817.00, for a total of $584,377.00.

For commercial sales her analysis began in 2004. She noted a downturn in MCGC's business beginning in 2009.

*Residential Loss*

In determining residential damages, Clark considered the number of tags issued and the actual number of units sold by MCGC for each calendar year and the market share of the tags that MCGC held every year. The market share is the

56

share that MCGC had of the total of number of tags that were being sold. Clark compiled a document with an analysis of these figures entitled the Residential Tag Trend that showed MCGC with a market share of 17.53% in 1990. By 2009, MCGC's market share had declined to 2.8%. In 1990, 9,756 tags were issued and MCGC actually sold 1,710 units. By 2009, 11,970 tags were issued and MCGC sold only 343 units. The document shows that from 1990 through 1999 MCGC's market trend varied from 17% to 20%.[13] Beginning in 2001, MCGC's market share dropped to 10.28% and steadily declined every year after that. Clark testified that she saw a correlation with Todd's testimony that sales and market share had declined based on her residential tags analysis.

Based on the figures, Clark determined that through 1999, MCGC had 18.7% of the market share. To determine MCGC's lost share of the business beginning in 2001, Clark used the 18.7% figure to calculate what MGCG's sales would have been based on its historical market share and then subtracted the actual sales with the difference being the amount of sales that were lost. Clark used an average sales price of $1,465.00 per unit based on the average unit price of the seventy-six units MCGC had remaining in their yard at the time of the change in the Sanitary Code.

From these figures, Clark calculated the lost revenues per year along with the lost gross profit. Gross profits lost was then calculated and an allowance for inflation was made since Clark relied on the $1,465.00 per unit figure. Again, the total past residential loss was calculated to be $4,660,846.00. Future lost profits

---

[13] There are no figures provided for the year 2000. Clark explained that in 2000, the price of the residential tags increased, thus in anticipation of the price increase tags were purchased the year before. Clark said that it was not a normal year across the State with regards to tags being issued. Thus, in the year 2000, 26,215 tags were issued, but in 2001 only 10,841 tags were issued.

pertaining to residential units was calculated by conducting a weighted average, which Clark described as a common calculation and terminology in accounting. The weighted average was discounted by 20% to account for business risk. Clark estimated the lost future profits based on twenty years at a 20% discount rate to be $2,663,030.00.

*Commercial Loss*

Clark testified that she compiled a chart detailing commercial jobs from 2004 forward that included the year of the job, the description of the job, the address, who the contractor plumber was, who the engineer was, the plant size, the trash-trap size, the percentage of the trash-trap size compared to the total plant size, whether the unit had a Gould pump or a grinder pump, and the duration of the permitting period.

Clark said that from 2004 through 2009, the permitting process was within thirty days from the engineer's submission of the request for permit. However, in 2009, the permitting process was extended. In normalizing the figures, Clark considered jobs that should have been permitted earlier, i.e., according to the thirty-day period, in figuring out revenues by year after 2009. Four jobs that were completed in 2010 should have been completed in 2009 if the permitting had not been delayed. The sum for these jobs was $367,109.50; the amount which was added to 2009. Thus, for the year 2009, Clark determined, after normalizing the figures, that the total commercial jobs billed should have been $1,116,400.00. Using the same accounting methods used for residential losses, the weighted average of past loss revenue for 2010 was $99,560.00, and $484,817.00 in estimated lost future profits based on twenty years at 20% discount rate. This figure was arrived based on the same sales as in 2010, however, it was possible

58

that the commercial business would continue to decline and that the loss could total as much as $1,091,000.00.

Clark testified that the delayed permitting process would have a negative impact from loss of client referrals. Further, she could not quantify the amount of future costs that would increase due to DHH's requirement of the grinder because of increased maintenance costs due to warranty repair, cost to the business, and damage to Cormier's reputation.

On cross-examination Clark was questioned whether all of the tags issued by the State were for ATUs with pump tank chambers. Clark said it was her understanding that the State does not differentiate between pump/no pump units when issuing the tags and that her calculations did not differentiate between units with or without pumps. She noted that a business share of a market can change for a variety of reasons such as the economy or competition. She also testified that she did not deduct business operating expenses in her calculations or use tax returns or compare any other manufacturer's commercial sales as none were available to her.

Clark admitted that even before the disparate treatment of Irion, MCGC's commercial sales had been declining. However, Clark said MCGC had formed another company and moved some its products to the other company categorized as the HOOT System sales.

### JAMES FREDERICK STULB

Stulb, a certified public accountant since 1984, was qualified as an expert in accounting, economic damages, and financial analysis. He testified he was not qualified to perform a market-share analysis. Stulb said he reviewed Clark's deposition, financial statements, and tax returns of Cormier for 2000 through 2010; HOOT Systems, Inc., for 2007 through 2010; and deposition of Anthony Lebato.

59

Stulb said that Cormier has various companies owned by his children that conduct business with MCGC. He said that the only 100% owned subsidiary was the trucking company. Other than transactions with the trucking company, he was unable to identify "intercompany transactions."

Stulb testified that Clark used gross profit in determining loss rather than actual cost, which he would not have done. Stulb said that he found that MCGC's sales level was "fairly consistent throughout the whole period all the way through 2010." He said that Clark used the entire gross profit percentage rather than a percentage of the total sales. Thus, he opined that MCGC's commercial sales' percentage of total sales ranged from 2.14% to a high of 10.89%–a very small portion of total sales.

Stulb further testified that he did not see a future loss because MCGC's sales had stayed the same and did not evidence a continued decline. He did not consider any issues regarding damage to reputation. Finally, Stulb testified that there were no damages that he could determine in either attached/detached pump stations or commercial systems. He said that he could find no significant loss of sales to MCGC, although he agreed that a customer base has value.

The statutory cap applies to limit general damages, but not special damages. None of the damages awarded to MCGC can be categorized as general damage awards. We agree with MGCG that the awards made by the jury under the headings "Damages: Residential Units" and "Damages: Loss of Business Reputation" are special damages not subject to the cap. DHH argues that the damages for loss of business reputation are more akin to damages for a claim of defamation, which fall under the auspices of general damages. We disagree under the facts of this case. While "loss of business reputation" would have preferably

60

been referred to as "loss of future earnings," we find that the jury's award closely tracked the loss of future earnings pertaining to residential sales that Clark testified to. In this instance, the damages caused by the loss of reputation were specifically quantified according to the market-share formula. MCGC proved via expert testimony that it had a reputable business reputation that was harmed to its detriment by loss of future earnings. *See Kim v. Kim*, 07-318 (La.App. 5 Cir. 10/30/07), 970 So.2d 1158. Moreover, after our extensive review of the entire record, we find the jury's damages awards were not manifestly erroneous. This assignment of error is without merit.

## CONCLUSION

The judgment of the trial court in favor of the plaintiff-appellee, Murphy Cormier Contractor, Inc., is affirmed. The costs of this appeal are assessed against the defendant-appellant, the State of Louisiana through the Department of Health and Hospitals in the amount of $66,362.45.

**AFFIRMED**.